NOT DESIGNATED FOR PUBLICATION

No. 119,684

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeals of
WALGREEN CO., et al.,
for the Years 2015 and 2016 in Johnson County, Kansas.

MEMORANDUM OPINION

Appeal from the Board of Tax Appeals. Opinion filed October 22, 2021. Affirmed.

*Ryan Carpenter* and *Kathryn D. Myers*, assistant county counselors, for appellant/cross-appellee Johnson County Board of County Commissioners.

*Darcy Demetre Hill*, of Property Tax Law Group, LLC, of Overland Park, for appellee/cross-appellant Walgreen Co.

Before BRUNS, P.J., GARDNER and CLINE, JJ.

GARDNER, J.: This judicial review action asks us to revisit the unanimous decision of the Board of Tax Appeals (BOTA) that established the ad valorem taxation for tax years 2015 and 2016 of real properties leased by Walgreen Co. (Walgreens). After receiving the Board of Johnson County Commissioners' appraised values of the properties, Walgreens appealed to BOTA. After an evidentiary hearing, BOTA lowered the valuations on each of the properties and ordered Johnson County to refund Walgreens for any overpayments. Neither party is apparently content with BOTA's ruling, as both petitioned for judicial review. Finding no error in BOTA's decision, we affirm.

1

*Factual and Procedural Background*

In June 2017, the Board of Tax Appeals held a consolidated hearing to hear expert witness testimony in several tax cases. Both tax years 2015 and 2016 and all Walgreens properties were combined in one evidentiary hearing.

At that hearing, experts for the County and for Walgreens agreed on some matters:

- Kansas law requires appraisers to value real estate in fee simple for ad valorem tax purposes;
- appraisals must be done in accordance with generally accepted appraisal practices (GAAP) and the Uniform Standards of Professional Appraisal Practice (USPAP);
- the income approach best indicates the values here; and
- market rents rather than contract rents should be used.

Still, the experts relied on different methodologies in valuing the properties.

*The County's Expert Testimony*

At the hearing, Tim Keller, MAI, of Keller, Craig & Associates, testified about a capitalization rate study he did for Johnson County in 2015 and 2016. Keller explained that when starting a capitalization rate study, he looks to all the sales in the county and sorts them based on whether the property was occupied and leased and if they were bought mainly for the property's income potential. Then he verifies the sales price and the income and expense information on the sale. If he is unable to verify the sale information, he omits that sale from the study. He uses only data from arm's-length transactions. He found the highest and best use for the properties was its current use as a convenience/pharmacy store.

2

Keller explained that in build-to-suit leases, the first tenant is the first-generation user and any later tenants are second-generation users. Keller testified that the Appraisal Institute, which publishes The Appraisal of Real Estate and *The Appraisal Journal*, do not state that build-to-suit leases cannot be used to determine market rent. Keller testified that The Appraisal of Real Estate is a reliable and authoritative source for appraisal practices and that the 14th edition was the most recent version. But Keller testified that *The Appraisal Journal*, which he described as a "forum for authors in the evaluation field," was not an authoritative source for generally accepted appraisal practices.

Keller explained that if he were looking at a building that was built for a particular tenant and then sold by the landlord to a third party, he did not make any adjustments for the price of the property because "the rent has been determined between the tenant and the landlord" and the third-party sale was unrelated to the rental agreement. Keller testified that his capitalization rate study contained no adjustments for property rights, tenant improvements, or similar items.

Tiffany Osborn, an appraiser with the Johnson County Appraiser's Office, testified in prefiled testimony on behalf of the County. She had inspected each of the properties involved in the case. She testified that generally accepted appraisal practices do not direct an appraiser to value occupied property as if it were vacant. She found all properties here were occupied so none should be valued as vacant.

Bernie Shaner also testified for the County. He agreed with Keller that build-to-suit rents are probative of market rents. He testified that build-to-suit leases and sale leasebacks are not financing arrangements because the real property ownership does not transfer to the tenant at the end of the lease. He would use build-to-suit rents as probative of market rent and would not make any adjustments if there were no nonrealty components such as furniture, fixtures, or equipment included in the rent.

Included in the County's exhibits are the income valuation worksheets for each property. For example, in the 2015 tax year the County classified the Walgreens located at 12601 Pflumm Road, Overland Park, a 14,492 square-foot retail property, as a class B property with a rental value of $15 per square foot of space. The County applied a 5% vacancy and collection amount and set the capitalization rate at 7.75%. Using that information, the County appraised this Walgreens at $2,496,000. It used the same methodology to appraise the other subject properties.

The capitalization rates were calculated by Keller, Craig & Associates. Keller's capitalization rate study calculations included the sales of new build-to-suit properties. Keller testified that the capitalization rate study did not make any adjustments for build-to-suit properties. Osborn testified that the capitalization rates do not reflect above market rents.

*Taxpayer's Expert Testimony*

Gerald Maier, a managing partner with Mainland Valuation Services and a certified general real property appraiser in Kansas, testified on behalf of Walgreens. Maier testified that he appraised 14 Walgreens locations for the 2015 and 2016 tax years and 5 additional stores for only the 2016 tax year. The valuation of some of those properties was not on appeal before BOTA for one or both tax years.

Maier testified that when he valued property in Kansas, he valued the fee simple estate, meaning the absolute ownership unencumbered by any other interest or estate. But because the properties were occupied and he recognized that BOTA might wish to see an estimated value of the properties as occupied, Maier included a hypothetical leased fee value which assumed the properties had two to three years remaining on a lease with a moderate credit tenant.

Maier found several sales of operating Walgreens stores, but most of those transactions included long-term leases. Maier explained that the long-term leases eliminated nearly all the risk that is generally associated with real estate investment, inflating the value of the subject property. Maier testified that it was inappropriate to estimate market rent by relying on sale/leasebacks, which he found were essentially financing agreements and typically involved long-term contract rights.

Maier used the same methodology to value each of the subject properties. Maier used three approaches—cost approach, sales comparison approach, and income approach—and valued each property in fee simple and, alternatively, as a hypothetical leased fee. Although he considered all three approaches, Maier gave "[s]ignificant consideration" to the income approach because it "is the most property specific when analyzing the income potential for the improvements" and "is generally considered to offer a reliable representation of investors' goals and objectives in regard[] to income producing properties." Because Maier ultimately relied on the income approach, we do not set out his cost approach or sales comparison approach.

The income approach is based on the anticipated net operating income to be generated by a property during a period of ownership. Maier views the income approach as the most reliable method for appraising income producing properties. In this approach, three categories of rents are potentially used as comparables. The first is first-generation leases, which are often based on construction costs and are often above market due to the nature of the transaction. The next is second-generation leases with renovation. There, the owner pays for renovations and amortizes the cost of the renovations over the life of the lease. Depending on how extensive the renovations are, the rental rates can approach the level seen in first-generation leases. The third category of leases are second-generation leases with no or minimal renovations.

5

Maier did not use any build-to-suit lease comparables in arriving at his valuations. He was able to find comparable leases and made adjustments as needed to the rental rates to arrive at his estimated value for the subject properties.

Maier estimated two values for each property—a fee simple value and a hypothetical leased fee value. The fee simple value was consistently the lowest. For example, when Maier valued one Walgreens location for the 2015 tax year and assumed a hypothetical leased fee estate (assuming that the property was occupied and two to three years remained on the lease term with a moderate credit tenant at the time of sale), its value was $2,350,000. When Maier valued that same property relying most heavily on the sales comparison approach—assuming Walgreens would no longer occupy the structure and that it would be sold as a fee simple estate—Maier valued the property at $2,100,000. Maier employed the same methodology to value each of the subject properties.

*BOTA's Summary Decision*

In its summary decision, BOTA found that both parties relied on the income approach to value the subject properties. BOTA found that the County's cost approach values were "significantly less than the County's income approach values, indicating that the County's income approach values were not reliable . . . ." BOTA found that Maier's hypothetical leased fee value best indicated the fair market value of the Walgreens properties.

BOTA ruled that the County had not met its evidentiary burden and that the subject properties should be valued based on Maier's hypothetical leased fee values. But BOTA also found that adjustments to his capitalization rates were necessary because Maier had failed to account for the age of the structures and the demographics of the properties' locations as represented by the median area income. So BOTA adjusted

6

Maier's blanket capitalization rates of 8.5% for 2015 and 8.25% for 2016 by lowering them by 1/4% for areas with median incomes between $75,000 and $100,000 and by 1/2% for areas with median incomes over $100,000.

*BOTA's Full and Complete Opinion*

The County and Walgreens moved for a full and complete opinion. BOTA's full and complete opinion found the County failed to meet its burden to show the correctness of its valuation. See K.S.A. 79-1609 (the County has burden of production and persuasion as to the valuation for taxation purposes of real property used for commercial purposes). BOTA then gave details why it did not find the County's evidence sufficient:

- the County's analysis was based on "only one class A rental comparison property and the class B properties are mostly build-to-suit properties";
- the County used a higher rental rate than it should have used for properties that were not build-to-suit properties; and
- the County used a lower vacancy rate than was typical in the market.

BOTA found Maier's hypothetical leased fee value was a better indication of fair market value than the fee simple value, which assumed that the property would be sold as vacant. BOTA found Maier's hypothetical leased fee value was a better indication of a property's fair market value because it assumed that the properties were occupied on the sale date, as would most likely be the case. Maier assumed the properties were occupied by a moderate credit tenant who had two to three years left on the lease. Maier had analyzed first- and second-generation leases but "determined that the first-generation leases were the product of a sale/leaseback and did not consider them." BOTA found that those arrangements were actually "financing vehicles." BOTA agreed that second-generation leases were better indications of market rent. But BOTA reduced Maier's capitalization rates and altered the final values as it had done in its summary decision.

7

*BOTA's Order on Reconsideration*

The County filed an amended petition for reconsideration with BOTA, arguing that BOTA did not comply with Kansas law when it adopted the hypothetical leased fee method of valuation and erred in some evidentiary rulings. Walgreens also petitioned for reconsideration, arguing that BOTA erred by not adopting Maier's fee simple valuations and by adjusting Maier's capitalization rates.

In its order on reconsideration, BOTA stated that its decision had inadvertently inferred that all "cost approach values were significantly less than the income approach values" and deleted that language. Otherwise, BOTA made no substantive changes.

Both parties petitioned for judicial review.

*Analysis*

On appeal, the County first argues that it established a prima facie case for its appraisal values, and Walgreens failed to rebut it using accepted appraisal methodology. Second, the County argues that BOTA adopted an appraisal method that is contrary to Kansas law. Underlying that argument is the County's argument that this court's prior opinion, *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 275 P.3d 56 (2012), was wrongly decided.

Walgreens' cross-petition argues primarily that BOTA should have used Maier's fee simple method, which consistently results in values lower than the County's valuations and lower than Maier's hypothetical leased fee valuations.

8

*General Legal Principles*

We review BOTA's decisions as directed by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. See K.S.A. 74-2426(a), (c); K.S.A. 77-603(a). Under the relevant statute, we may grant relief if the appellant shows that BOTA's decision was based on errors of law and fact, was otherwise arbitrary, capricious, or unreasonable, or was not supported by substantial evidence. K.S.A. 77-621(c).

We begin by reviewing some general legal principles. The test for finding arbitrary and capricious conduct depends on the reasonableness of and foundation for the action. An order is arbitrary and capricious if it is unreasonable or without foundation in fact. See *In re Equalization Appeal of Tallgrass Prairie Holdings*, 50 Kan. App. 2d 635, 659-60, 333 P.3d 899 (2014). So whether BOTA acted unreasonably, arbitrarily, or capriciously depends on the quality of its reasoning. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010).

To the extent this issue involves interpretation of a statute, our review is unlimited. *In re Tax Appeal of BHCMC*, 307 Kan. 154, 161, 408 P.3d 103 (2017). Otherwise, we review factual findings to determine whether they are supported by substantial evidence in light of the record as a whole. K.S.A. 77-621(c)(7); *Sierra Club v. Moser*, 298 Kan. 22, 62-63, 310 P.3d 360 (2013). In making this determination, we must review evidence that supports and detracts from BOTA's findings. K.S.A. 77-621(d). "Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion." *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 916, 157 P.3d 1109 (2007). In reviewing the evidence, we are not to reweigh or engage in de novo review of the evidence. K.S.A. 77-621(d); *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

9

We strictly construe tax provisions in favor of the taxpayer. See *In re Tax Appeal of River Rock Energy Co.*, 313 Kan. 936, 944, 492 P.3d 1157 (2021). When considering whether BOTA's decision is supported by substantial competent evidence, we will reverse only if we find that the decision was "so wide of the mark as to be outside the realm of fair debate. *Prieb*, 47 Kan. App. 2d at 137.

The subject property is real property mainly used for commercial purposes, so the County had the burden of production and persuasion before BOTA to show the correctness of its valuation. K.S.A. 79-1609. Likewise, the County, as the party challenging the validity of BOTA's action on appeal, bears "[t]he burden of proving the invalidity of agency action." K.S.A. 77-621(a)(1). And even when we find that BOTA erred, we do not reverse if that error was harmless. K.S.A. 77-621(e); *Sierra Club*, 298 Kan. at 47; *In re Equalization Appeal of Kansas Star Casino*, No. 116,782, 2018 WL 3486173, at *10 (Kan. App. 2018) (unpublished opinion).

When valuing property for ad valorem tax purposes, Kansas law requires that the valuation be based on a "fee simple interest, not the leased fee estate." *Prieb*, 47 Kan. App. 2d at 132.

> "Fee simple interest is defined as absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. Stated another way, ownership of the fee simple interest is equivalent to ownership of the complete bundle of property rights that can be privately owned. This interest is in contrast to a leased fee interest defined as the ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." 47 Kan. App. 2d 122, Syl. ¶ 5.

Although Kansas tax statutes before 2016 do not refer to the term fee simple interest, "it is clear that the legislative intent underlying the statutory scheme of ad

valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal." 47 Kan. App. 2d at 130 (citing K.S.A. 79-501 and K.S.A. 79-503a). The fee simple interest of real estate consists of tangible property, excluding intangible property interests. See K.S.A. 79-102; see also *In re Tax Protest of Strayer*, 239 Kan. 136, 142, 716 P.2d 588 (1986). The Legislature amended K.S.A. 74-2433 in 2016 to affirmatively state that valuation appeals before BOTA shall be decided upon a determination of the fair market value of the "fee simple" of the property.

Requiring valuation of the fee simple interest is consistent with K.S.A. 79-102, which states: "[T]he terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." This definition requires that all "rights and privileges" in real property are to be valued. See *Prieb*, 47 Kan. App. 2d 122, Syl. ¶ 6. A leasehold estate, except an oil and gas lease, is real estate under Kansas law. A leasehold estate is not subject to real estate taxation. Instead, a unitary assessment method is used in which one value is assigned to a lot or tract of real estate and one tax is assessed and levied on it. *Board of Johnson County Comm'rs v. Greenhaw*, 241 Kan. 119, 123, 734 P.2d 1125 (1987). As a result, "[f]or purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." *Prieb*, 47 Kan. App. 2d 122, Syl. ¶ 6.

K.S.A. 79-412 is the statutory basis for the unitary assessment method: "It shall be the duty of the county . . . appraiser to value the land and improvements. The value of the land and improvements shall be entered on the assessment roll in a single aggregate, except as hereinafter provided." In determining the ad valorem valuation, Kansas law assumes the hypothetical condition of an assumed sale as of January 1 of the applicable tax year. K.S.A. 79-1455 requires that "[e]ach year all taxable and exempt real and

tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a."

K.S.A. 79-503a defines "'[f]air market value'" as the amount of money that "a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." That statute gives broad guidance on the methods that may be used to determine the fair market value of a property:

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards

12

or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law.

Valuations must be performed in accordance with the USPAP. See K.S.A. 79-505; *In re Equalization Appeal of Johnson County Appraiser*, 47 Kan. App. 2d 1074, Syl. ¶ 9, 283 P.3d 823 (2012). "These standards are embodied in the statutory scheme of valuation, and a failure by BOTA to adhere to them may constitute a deviation from a prescribed procedure or an error of law." *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, 735, 88 P.3d 242 (2004).

I.      *Did Walgreens Fail to Rebut the County's Prima Facie Case?*

The County first argues that it made a prima facie case that its ad valorem values reflect fair market value. But the County bases that conclusion solely on the fact that Walgreens did not move for a peremptory ruling, so BOTA did not grant one. Rather, BOTA considered the facts. But BOTA expressly found in its decision that the County failed to meet its burden of proof. That conclusion is not diminished by BOTA's having considered all the facts, in an abundance of caution.

The County's main assertion, as we understand it, is that Walgreens failed to rebut its prima facie case because Walgreens' methods fail to comply with Kansas law. But this is not a stand-alone issue. Rather, that depends on the validity of the County's assertion

that its methods comply with Kansas law, while Walgreens' methods do not. Whether that assertion succeeds or fails depends on the resolution of the issues below.

II.     *Did BOTA Erroneously Interpret or Apply the Law?*

The County next alleges multiple ways in which BOTA erred in its legal conclusions or by adopting Maier's hypothetical leased fee approach.

*Appraisers' Use of Hypotheticals*

The County argues that the only hypothetical that appraisers can use when determining the fair market value of real property is the January 1 sale date. See K.S.A. 79-1455.

But the list of factors in K.S.A. 79-503a (above) is nonexclusive—the statute does not prohibit the use of additional hypotheticals. "[W]e do not presume that a hypothetical condition may not be used in valuation merely because it was not included in the list." *In re Equalization Appeal of Arc Sweet Life Rosehill*, No. 113,692, 2016 WL 3856666, at *10 (Kan. App. 2016) (unpublished opinion); see also 2016 WL 3856666, at *15 (finding it permissible to determine the difference between the value of the property under a hypothetical vacant condition and its value as occupied to isolate the value of the taxable estate separate from the business being conducted on the subject property). Maier disclosed the factors he used in his hypotheticals. And the County admits that its Property Valuation Division's standards permit use of a hypothetical condition if it is directly related to the appraisal assignment. See USPAP, p. U-3 (2014/2015 ed.).

The County's remaining arguments do not assert that BOTA erroneously interpreted the law. Rather, the County argues that *Prieb* was wrongly decided and should no longer bind BOTA's decisions. We address these claims of error below but are

14

unpersuaded. See *In re Equalization Appeals of Walmart Stores*, 61 Kan. App. 2d __,
2021 WL 4699199, at *9-10 (Kan. App. 2021).

*Did Walgreens Value the Wrong Interest?*

The County argues that *Prieb* incorrectly defined fee simple and that Walgreens,
by relying on *Prieb*'s definition, valued the wrong interest.

*Prieb* relied on The Appraisal of Real Estate's definition of fee simple as:
"Absolute ownership unencumbered by any other interest or estate, subject only to the
limitations imposed by the governmental powers of taxation, eminent domain, police
power, and escheat." The Appraisal of Real Estate, p. 114 (13th ed. 2008).

But the County invites us to rely instead on the definition of fee simple in Black's
Law Dictionary 760 (11th ed. 2019):  "An interest in land that, being the broadest
property interest allowed by law, endures until the current holder dies without heirs; esp.,
a fee simple absolute.—Often shortened to fee."

Black's definition of fee simple is describing the legal interest. Attorneys know
that one may own land in fee simple even if that land is "encumbered" by a mortgage, a
restrictive covenant, or a lease, for example. See, e.g., *Knop v. Gardner Edgerton Unified
Sch. Dist. No. 231*, 41 Kan. App. 2d 698, 706, 205 P.3d 755 (2009) (discussing restrictive
covenants). But in appraisal practice, a fee simple estate is "unencumbered by any other
interest." The Appraisal of Real Estate, p. 114 (13th ed. 2008). Although the County does
not explain the significance of the definitional differences here, we assume it prefers
Black's definition because it may open the door for them to consider contract leases. And
in this case, as is perhaps likely in most big-box cases, using contract leases rather than
market leases may increase the valuation amounts.

15

This court recently considered and rejected a similar argument:

> "The County dislikes *Prieb*'s definition of 'fee simple interest' and urges us to instead apply the definition of that term from Black's Law Dictionary. But we find it unnecessary to parse any linguistic differences between the two because the County does not show us how the *Prieb* definition is wrong, how the *Prieb* definition substantially differs from Black's definition, or how use of Black's definition would make a difference in BOTA's decision." *In re Tax Appeal of Arciterra BP*, No. 121,438, 2021 WL 1228104, at *9 (Kan. App. 2021) (unpublished opinion).

We find this analysis to be well-reasoned and adopt it here.

The County's reply brief also argues that *Prieb* misunderstood the term fee simple. In support, it cites and attaches as an appendix to its brief an official policy adopted by the International Association of Assessing Officers dated August 2019 (after BOTA decided this case) and a paper which addresses valuing big-box retail stores. But the County fails to show us that either document was part of the record before BOTA. Kansas Supreme Court Rules require an appendix to consist "of limited extracts from the record on appeal." Supreme Court Rule 6.02(b) (2021 Kan. S. Ct. R. 36). Finding no indication that either document is in the record on appeal, we disregard them.

*Does the Unitary Assessment Method Require Appraisers to Include the Leasehold Estate in Valuations?*

The County asserts that the unitary assessment method requires appraisers to include the "contributory value of the leasehold estate" when valuing real property. Relatedly, it states that BOTA's rejection of the County's values violates the constitutional mandate that valuations be uniform and equal based on the actual conditions of real property.

16

But Maier's hypothetical leased fee methodology was an attempt to reflect the actual conditions of real property, as leased, at market instead of contract rates. And the County makes no independent argument supporting these assertions. Rather, it cites one case—*Board of Johnson County Comm'rs v. Greenhaw*, 241 Kan. 119, 734 P.2d 1125 (1987). In *Greenhaw*, our Supreme Court addressed the valuation of property with a long-term lease on undeveloped land. The owner had leased the land to the Kansas Land Development Company for 82 years. When the land use changed from agricultural to commercial, the owner's tax liability increased from $1,275 per acre to $17,611 per acre. Under those unusual circumstances, BOTA found that for all practical and legal purposes, Greenhaw's lease was similar to a sale and should be treated as a sale for purposes of taxation. BOTA noted that the land had not changed from agricultural to commercial because it was awaiting future development. 241 Kan. at 120. Our Supreme Court affirmed, holding it was appropriate for BOTA to consider the lease in determining value to "preserve equal treatment and the rule of uniformity in Johnson County." 241 Kan. at 124.

Yet we do not find *Greenhaw* instructive here, as its unique long-term lease is unlike a commercial lease of a building with an ongoing retail lessee. More recent cases are more on point. See, e.g., *In re Equalization Appeal of Target Corporation*, 55 Kan. App. 2d 234, 410 P.3d 939 (2017); *Prieb*, 47 Kan. App. 2d 122; *Arciterra*, 2021 WL 1228104; *In re Equalization Appeal of Arc Sweet Life Rosehill*, 2016 WL 3856666.

*Does* Prieb *Misrepresent Accepted Appraisal Practice?*

The County argues that if The Appraisal of Real Estate does not list a methodology as a generally accepted appraisal practice, and the methodology is not otherwise prescribed by law, then the methodology cannot be used to determine an ad valorem valuation.

17

But the County fails to show that The Appraisal of Real Estate is the sole source of generally accepted appraisal procedures. *Prieb* and other published cases are also valid sources of law. The County states that *Prieb* does not expressly require an appraisal methodology and, through a series of quotes, implies that The Appraisal of Real Estate contradicts the methodology used by Maier to value the subject properties. But the County's argument is undeveloped, containing multiple quotes without context or legal analysis.

To the extent that the County is arguing that *Prieb* misrepresents accepted appraisal practices, the County's argument is unpersuasive. The court in *Prieb* stated that leased fee interests should not be included in ad valorem valuations and provided reasoning for the holding. *Prieb*, 47 Kan. App. 2d 122, Syl. ¶¶ 6, 7. The best time for the County to contest that holding would have been in a petition for review to the Kansas Supreme Court.

*Did Maier Rely on an Incorrect Highest and Best Use?*

The County next argues that Maier incorrectly determined that the highest and best use of the subject properties was as general single user retail space, rather than as a convenience/pharmacy store. But this appears to be a distinction without a difference, as the County does not show how this determination affected BOTA's analysis or result. See K.S.A. 77-621(e). Although the specificity of the highest and best use of a retail property is interesting in an academic sense, we do not give advisory opinions. See *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016) (holding that "Kansas courts do not issue advisory opinions").

*Was Maier's Direct Capitalization Rate Based on a Hypothetical Contrary to Known Facts?*

The County next argues that Maier's direct capitalization rate does not reflect reality, given its reliance on hypotheticals. But Maier used his hypotheticals to try to comply with *Prieb*'s requirement to exclude unadjusted build-to-suit leases from property valuations, while reflecting the reality that the properties were leased. We believe he succeeded in that attempt.

Maier, via his hypothetical leased fee appraisal, sought a value that assumed the property was fully leased at market rent. He thus sought a value that assumed the property could be leased at market rent at a normalized occupancy level, rather than assuming the property could not be leased or was leased long-term. Maier assumed a shorter lease term than is often present in retail stores such as Walgreens because Kansas law requires appraisals to reflect market rent—property rights rather than contract rights. The assumptions Maier made minimize any contract rights that may influence his value estimate, as *Prieb* requires. Walgreens fails to show that Maier's valuation was not an appropriate way to value the fee simple interest, as *Prieb* requires.

Our court has upheld in other cases the methodology that Maier used and that BOTA adopted here. See, e.g., *In re Target Corporation*, 55 Kan. App. 2d at 239, 244-45 (finding Maier's use of a hypothetical leased fee analysis was supported by substantial competent evidence and complied with USPAP); *Arciterra*, 2021 WL 1228104, at *9 (upholding BOTA's reliance on Maier's methodology and use of a hypothetical leased fee analysis). We do so as well. We do not mean to suggest that Maier's hypothetical leased fee analysis is the sole methodology that complies with Kansas law. But we find no error in BOTA's reliance on that method here.

19

*Are Build-to-suit Leases Like Financing Agreements?*

The County also challenges the *Prieb* court's statement that build-to-suit leases are essentially financing agreements. In *Prieb*, the court stated:

"Before consulting various authoritative sources on this question, we take a common-sense approach to the problem: What is the nature of a build-to-suit lease? We suggest that such a lease is essentially a financing agreement between a lessor and a lessee, and the rental rates therein are based in large part upon the revenue needed to amortize the investment required for the required construction—plus a measure of profit—over the lease term . . . . Accordingly, when one takes a snapshot view of rental rates at any time during such a lease, these rates are not reflective of market rent, but rather just reflective of the rate required in that specific situation to continue an agreed revenue stream to amortize the lessor's investment, subject to a host of financial risks. In other words, contract rents in a build-to-suit lease are not designed to capture market value for each period within the lease term, but rather are designed to amortize an investment made at the outset and may vary dependent on factors that are unrelated to the real estate market thereafter. Reliable source material is in agreement with this overview." 47 Kan. App. 2d at 132-33.

The County argues that a finance lease or a capital lease transfers title of the leased property to the lessee at the end of the lease term but that a build-to-suit lease does not, so the two are not identical. But this argument misses the point. By stating that build-to-suit leases were "essentially" financing agreements, the *Prieb* court did not equate the two in every detail or in every legal respect. Rather, it explained that because build-to-suit leases shared some basic characteristics with financing agreements, they are atypical of market rent so must be adjusted if used in appraisals. The County suggests on appeal that properties such as Walgreens are a market of their own, but it was unable to persuade BOTA of that, and we are unpersuaded as well.

*Should Build-to-suit Leases be Included in Ad Valorem Valuations?*

The County next echoes its expert testimony that build-to-suit leases should be included when valuing real property. But our task is not to independently determine which valuation methodology is best. BOTA heard the County's experts and Walgreens' expert, evaluated the evidence, followed the published decisions on valuation as it was bound to do, and made a reasoned decision that complied with the law. We find no error in BOTA's legal analysis or in its apparent reliance on or application of *Prieb.*

III.    *Is BOTA's Decision Supported by Substantial Competent Evidence?*

The County mentions a substantial competent evidence issue but fails to argue it. We assume that the County's argument is that because *Prieb* was incorrect, its expert testimony complied with the law while Walgreens' expert evidence did not. But we have rejected the County's underlying premise that *Prieb* is dead. And if the County meant to raise some other issue of substantial evidence, it waives or abandons it by failing to develop the argument. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (issues not adequately briefed are considered waived or abandoned); *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) (failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue).

IV.    *Was BOTA's Decision Unreasonable, Arbitrary, or Capricious?*

Similarly, the County mentions that BOTA's decision was unreasonable, arbitrary, or capricious as an issue but it does not develop this argument. It states only that BOTA's decision was unreasonable, arbitrary, or capricious because it based the fair market value of the properties on appraisals that do not generally match generally accepted appraisal procedures and standards. Yet the County does not state which GAAP standard was

violated or how BOTA's decision violates that GAAP standard. This argument merely recasts the County's anti-*Prieb* arguments that we have rejected above. The County does not support its contention that BOTA's order is unreasonable, arbitrary, or capricious with any factual argument or legal authority. We thus consider it waived or abandoned.

Similarly, we find all other issues mentioned by the County but not decided above to be waived by the County's failure to adequately brief them. The County has not shown the invalidity of BOTA's action.

## V.     *Did BOTA Err by Embracing a Leased Fee Valuation?*

Walgreens' cross-petition argues that BOTA erred by adopting Maier's hypothetical leased fee valuations rather than his lower fee simple valuations.

BOTA determined that Maier's hypothetical leased fee appraisal was the best indication of a particular property's fair market value because "the sales price is based on an occupied property." Maier's hypothetical leased fee appraisal assumed the properties were occupied and a short-term lease was in place at the time of the sale. In contrast, his fee simple valuation assumed the properties were vacant.

Walgreens contends that by relying on Maier's hypothetical leased fee appraisals, BOTA failed to follow *Prieb*'s directive that for the "purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." 47 Kan. App. 2d 122, Syl. ¶ 6.

But Maier's hypothetical approach did not value the "leased fee interest." As Maier explained, a leased fee appraisal method would have valued the actual contract in place. *Prieb* used that term as Maier did, defining it as "'[t]he ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the

22

reversionary right when the lease expires.'" The Appraisal of Real Estate, p. 114." *Prieb*, 47 Kan. App. 2d at 130. The leased fee is thus a lesser estate in property including only the landowner's right to receive rents during the term of the lease, plus the value of the reversion upon its expiration. 47 Kan. App. 2d at 132. Yet Maier did not value the contract in place, or the leased fee interest, but the property rights as determined by a hypothetical lease.

Walgreens fails to show that Maier's valuation was not an appropriate way to value the fee simple interest, as *Prieb* requires. BOTA reasonably determined that Maier's hypothetical leased fee appraisal was the best indication of the property's fair market value. We find no reason to set aside that determination.

Neither party has shown the invalidity of BOTA's decision regarding the valuation of the Walgreens properties. We, therefore, affirm BOTA's full and complete opinion.

Affirmed.